# Fleishon v. Zoning Board of Adjustment

338

OLIVER, P. J., October 20, 1955.—This is an appeal from a decision of the Zoning Board of Adjustment, affirming the action of the Zoning Division of the Department of Licenses and Inspections in granting permits for a certain structure and outdoor lot on premises at the east side of Seventy-sixth Street, 289' 10" south of the side of Woodcrest Avenue, in a "D" residential district. The lot in question is large and irregularly shaped, approximately 600 feet long from west to east, with a width of about 200 feet directly along a driveway at the rear of seven houses facing on Seventy-sixth Street at its western end. From there it tapers off to a width of about 113 feet at its eastern end. This interior lot is bounded on the north, east and south sides by row dwellings facing respectively on Woodcrest Avenue, Seventy-fifth Street and Malvern Avenue, and on the west, with the exception of 64 feet, by row houses fronting on Seventy-sixth Street. The lot has no street frontage other than this 64 feet on Seventy-sixth Street and it extends inward from that street at that width for about 108 feet and there widens out to 220 feet as above stated.

The application is for a structure containing 54 family dwelling units, each of two stories, all opening on a central court in the middle of four sections of the structure, and also for outdoor parking in a space, 18,600 square feet in area, at the narrow easterly end of the lot. The Department of Licenses and Inspections granted a permit on the theory that the proposed structure and parking lot met all the technical requirements for a "D" residential district. The Zoning Board

of Adjustment was of the opinion that the zoning administrator could issue these permits as a matter of right under the zoning ordinance and that there were no questions which required its determination. It therefore affirmed this action and the matter was appealed to this court. On October 27, 1954, we remanded the case to the board for the taking of additional testimony and reconsideration of the issues raised. Substantial testimony was heard by the board, following which the Zoning Board of Adjustment again affirmed the action of the zoning administrator. The vote of the board, however, was 3 to 3, and the board therefore submitted both a majority and a minority set of findings.

The unusual shape of the lot in question is due to the fact that the city block in which it is located is not rectangular. Its north side is shorter than its south side, and its length on its easterly side, along Seventy-fifth Street, is only approximately 60 percent as great as its length along Seventy-sixth Street.

In the past, builders developed the street frontages of this city block without giving any apparent consideration to what might be done with the substantial tract left undeveloped in the center of the block. They erected 27 houses at the north on Woodcrest Avenue, eight houses at the east on Seventy-fifth Street, 37 houses at the south on Malvern Avenue, and seven houses at the west on Seventy-sixth Street. Along the rear of these houses they constructed 15-foot wide supplementary driveways, clearly intended for use by the adjoining house owners as a means of access to the private garages built at the rear of their homes.

The land left undeveloped in the interior of the block was in four separate parcels. The applicant for a zoning permit acquired title to all of them and now proposes to develop them as a whole in the manner above stated.

The owner-applicant, claiming a right-of-way over the 15-foot wide *supplementary* driveways above referred to, proposes to use those driveways as the *primary* means of access to the 54 multiple dwelling units he plans to erect on this irregular lot, and to the outdoor parking area to be created at its easterly end. However, a reference to paragraph 4, and to the map, in the stipulation dated June 30, 1955, filed herein, shows that lot no. 1, on which more than half of the proposed 54 dwelling units are to be erected, *has no easement whatever* relating to these driveways, or any of them. This court would be remiss if it failed to point out that the mere fact certain parts of this assembled tract of land enjoy an easement over the 15-foot driveways does not extend that right to lot no. 1 or to the persons who will occupy housing units erected thereon.

"It is elementary law that an easement cannot be extended by the owner of the dominant tenement to other land owned by him adjacent to or beyond the land to which it is appurtenant, for such an extension would constitute an unreasonable increase of the burden of the servient tenement." Kanefsky v. Dratch Construction Co., 376 Pa. 188, p. 195 (1954). " 'The right to the use of an alley or driveway is appurtenant to the abutting lot to which the easement is granted and is not personal to the owner of the lot. It may not be used by him for the benefit of other lots, etc., owned by him.' " Walker v. Walker, 153 Pa. Superior Ct. 20, p. 27 (1943).

This court must also point out that the proposed use of supplementary driveways as the *sole* means of servicing the proposed 54 units will place upon them vastly increased burdens obviously not intended in the easements granted to the other and smaller parcels of land assembled by the backers of this building project.

We shall therefore discuss first the question whether the applicant should have obtained a Board of Adjustment certificate covering the proposed open air parking space at the easterly end of the lot.

Section 26 (6) of the Philadelphia Zoning Ordinance provides as follows:

"An open air parking space shall not be permitted in "A" or "B" residential districts, and shall in any other residential or commercial district require a Board of Adjustment certificate, as hereinafter provided. . . ."

The amendment to this ordinance, approved June 27, 1951, recites its purpose to be "To amend an ordinance known as the 'Philadelphia Zoning Ordinance', approved August 10, 1933, by extending the provisions thereof to include requirements for off-street parking for multiple dwellings hereafter erected, and the modification of existing regulations in connection therewith". It then sets forth the amendments, which include the following:

"By adding at the end of paragraph (6), as amended, of §26. 'General Provisions', the following: (Subject to paragraph (10) of this Section.)

"By adding to §26. 'General Provisions', the following paragraph: (10) *Off-street Parking.* With every structure hereafter erected which is intended, designed or used for a multiple dwelling there shall be provided on the same lot parking spaces with adequate access to a street or driveway, for the use of the occupants of the dwelling."

In no place does the amending ordinance repeal paragraph (6) or any part thereof.

Our conclusion is that paragraph (6) and paragraph (10) must be read together. The mere fact that a parking space, with adequate access to a street or driveway, must be provided in a case such as is now

before us, is no reason for striking out the provision of paragraph (6) which requires a Board of Adjustment certificate. Under section 29(5) of the zoning ordinance such certificates may be issued by the board "after public hearings, held after due notice and publication of the time, place and purpose of the hearing". The facts in this case clearly demonstrate how essential it is that the two paragraphs, (6) and (10), be read and applied together.

The intention of city council to keep the requirement for certification intact in section 26(6) is further strengthened by the fact that this section was again amended as recently as December 8, 1954, when city council established a new zoning district to be known as the "AA" residential district. The amendment of section 26(6) merely added the "AA" district designation to the prior form of the ordinance and *reënacted the requirement for the Board of Adjustment certificate in "any other residential or commercial district"*. If city council had intended to repeal this requirement in 1951 when section 26(10) was added, we believe it would have changed the form of the new amendment of section 26(6) on December 8, 1954. Its failure to do so indicates a clear intention to keep in the ordinance the requirement for a certificate at all times, and strengthens the conclusion we have reached.

Let us look further at the facts. As we have seen, there are already 79 row houses surrounding this interior lot, all using the aforementioned 15-foot driveways for access to their garages. This is obviously a supplementary use as all of these houses face directly on public streets. It is now proposed to burden these driveways by making them the *primary* driveways for the proposed new 54 housing units to be erected upon the interior lot. As already pointed out, more than half of these units are to be located on a part of the tract which has no easement whatever over these driveways. For them, no access to driveways or streets has

been provided. As to increased burden on these driveways by subjecting them to a primary use, those members of the Board of Adjustment, who voted to uphold the granting of the permits, in their fourth supplementary conclusion of law stated: "These driveways were never meant for such (namely, commercial) vehicles . . . and if some use them it will be without authorization."

For primary use by the new units, the driveways should be wide enough and strong enough to accommodate, among other large and heavy vehicles, furniture moving vans, parcel delivery trucks, garbage and trash removers, fire apparatus and fire department emergency rescue cars, all of which have a maximum width of at least eight feet; also milk and bread delivery trucks which have a maximum width of 7 feet. Even aside from the question whether such increased burden would be illegal, it must be obvious that 15-foot driveways are grossly inadequate. How could an eight-foot wide vehicle pass another on a 15-foot driveway? Indeed, it would require skillful maneuvering for it to pass even an ordinary automobile, for there must be some space left at both sides and in the center. The danger to persons in the area in case of fire or other emergency must be obvious. The hearing judge and this court en banc were shocked by the ease with which the zoning administrator and the majority of the zoning board brushed aside such serious considerations.

At its first hearings the zoning board actually ruled out testimony as to the traffic problems. When this court referred the matter back to the board, the court pointed out that even a cursory examination of the plans showed that the proposed development, as now planned, could and probably would result in dangerous fire hazards, undue congestion, serious traffic problems, and a possible infringement upon the rights of way held by owners of the properties surrounding this tract of land.

The zoning board's attention was also called to the fact that it was not created to be a mere rubber stamp and that it had the power to consider the issues de novo and was not bound by the determinations of an administrative official (see opinion filed, dated October 27, 1954). However, after hearing testimony, the board spit 3 to 3 and thus failed to overrule the zoning administrator.

This result was reached notwithstanding the following testimony before the board.

Leslie Williams, former traffic engineer for the City of Philadelphia, testified that the parking lot would serve both as a parking lot and as a service area for commercial vehicles servicing the proposed 54 units; that he had made a thorough-going study of the surrounding streets and driveways; that the width of the existing driveways is entirely unacceptable and does not meet the minimum standards required for the use to which they will be put; that, if there is no parking, the minimum width for such driveways should be 20 feet; that, with parking on one side, it should be 26 feet; that there should also be a 4-foot sidewalk for pedestrians; that there would be no authority to enforce no-parking regulations if any were adopted; that there are bound to be cars and also commercial vehicles parked, adding to the inadequacy of these driveways; that the eight-foot wide trucks used today make it impossible for them to pass each other on 15-foot alleys; that these particular driveways are constructed on a cinder base with only 3 to 4 inches of concrete, making them inadequate for the type of use to which they would be put by this proposed development; that in a short time the surface would be broken down and holes would appear; that the approaches to the driveways have high banks and walls at their exits, making movement in and out dangerous; that some of the turning radii at corners are entirely too narrow; that the pro-

posed development would be not only dangerous from the point of view of traffic safety, but also as a fire hazard, and that, as the parking lot is more than 200 feet from the proposed buildings, people will not drive that distance and then go into their units, but will park on these narrow driveways at the rear of the buildings, adding to the congestion.

The zoning administrator also testified and displayed a total disregard of the hazards so plainly evident in this development. He interpreted the words "adequate access" to be fully complied with "if on this property you can drive *a car* into a driveway or street". He added, "As long as you can drive *a car* into a driveway to get off the property into a street, that's what I consider adequate. He also testified he did not take into consideration, in the matter of adequacy, whether a driveway was for one-way or two-way use. He added, "We have even accepted eight-foot driveways as being adequate". His testimony indicated that he was applying without discrimination standards suitable for a driveway "up side yards on a man's property", to a situation involving 79 houses and 54 housing units. He did so with full knowledge that the State provides for at least 9 feet of width *to each traffic lane.*

While three members of the zoning board supported these erroneous views, three other members did not. They filed findings of fact which show clearly the inadequacy of access provided by the existing driveways, and their inherent dangers.

The zoning administrator and the members of the board who supported him interpreted the phrase in section 26 (10), calling for parking spaces with "adequote access" to a street or driveway, to require merely that from the parking space a man must be able to drive a car onto a driveway, no matter how small and utterly inadequate it may be. In that sense the provision of the zoning ordinance is utterly meaningless

and we reject such interpretation. To mean anything at all, "adequate access" must involve the probability that all clearly foreseeable traffic will be able to proceed with reasonable safety to and from the parking area. Furthermore, they did not take the trouble to inquire whether the occupants of these proposed units would have any right to use the existing driveways. Surely, persons having no right to use a driveway cannot be said to have "adequate (or in fact any) access" to it.

Since, admittedly, section 26 (10) of the zoning ordinance requires that any multiple dwelling shall have adequate access to a street or driveway, it necessarily follows that the zoning administrator and the zoning board cannot shut their eyes to the question whether the proposed housing units will or will not enjoy an easement (and the extent thereof) over existing private driveways which the units are to use. The establishment of such easement by the applicant by affirmative proof is one of the factors which they should insist on in every such situation.

The enabling Act of May 6, 1929, P. L. 1551, and section 1 of the city's zoning ordinance, both state that zoning is "for the purpose of promoting the health, safety, morals, and general welfare of the community". Section 3 of the act expressly provides that zoning regulations "shall be made in accordance with a comprehensive plan, and designed to lessen congestion in the streets, to secure safety from fire, panic and other dangers". The regulations established by our city zoning ordinance are not an end in and of themselves; they exist for the ultimate purposes above set forth, and must be so interpreted.

We therefore hold that the permits in this case were issued in direct violation of both paragraph (6) and paragraph (10) of section 26 of the zoning ordinance.

This appeal also involves the question whether the proposed construction violates section 2 (18) (a) of

the zoning ordinance, which provides that the front yard shall be "A yard of the full width of the lot, and not less in depth than the minimum distance required between the street line and the building set-back line in each district".

The only street frontage enjoyed by this exceptionally large interior lot is the comparatively small 64-foot frontage on Seventy-sixth Street. As already pointed out, the lot extends inward at that width for approximately 108 feet to the rear of the seven houses on Seventy-sixth Street and there the lot broadens out to a width of approximately 220 feet. The proposed structure will take full advantage of this width. What, in all fairness, is the "full width" of this lot?

The zoning administrator held that the front yard complies with the ordinance as it is the full width of the lot measured at the line where the lot is adjacent to the street. The zoning board agreed with that interpretation, stating, "Otherwise, it would well nigh be impossible to construct a building on lots which broadened out at the rear". With this point of view we cannot agree, for it is conceivable that an owner of a large interior lot might have only a one-foot street frontage, and 100 feet behind that a usable lot width of 220 feet, as in the case before us. Certainly the present owner should have a right to develop his land, but the obvious solution is for him to apply for a certificate of variance.

There is also a question whether this proposed structure is one building, or four or more buildings set in a quadrangular layout and joined by a 10-foot overlap at each corner of the quadrangle. The zoning administrator, in the absence of any definition of the term "building" in the zoning ordinance, adopted the converse of a definition found in the Building Code as follows: "For the purpose of this code, each portion

of a building separated from other portions by an unpierced fire wall shall be considered as a separate building." From that he concluded that, as the proposed structure is to have pierced fire walls in the basement at its several corners, it must be held to be one building. The members of the zoning board who voted to uphold the zoning administrator also pointed out that it is proposed to have the entire structure serviced by central heating and water systems. As against that, there are separate entrances for various sections of the proposed structure, and no connections between these sections on any floor level above the basement.

While the zoning ordinance did not contain a definition of "separate building", a common sense interpretation would define those words to mean a structure in which there is a common entrance for all of the component units thereof and ready access from one part of the structure to another. Where these elements are missing, each unconnected unit should be considered a "separate building" and we so hold. Based on the problem raised by this case, city council has clarified the zoning ordinance by an amendment approved May 12, 1955. It adds the following definition to section 14 of the zoning ordinance:

"(i) SEPARATE BUILDINGS. Where any structure intended, designed or used for residential purposes is subdivided above the basement level into separate dwelling units which are not interconnected or served by a common entranceway at ground floor level, each such subdivision of the structure shall be considered a separate building, provided that each such separate building may have additional entranceways serving the units on the ground floor level."

Judged by the common sense standards set forth in this amendment, the proposed development planned by

the applicant would be considered for what it really is, namely: a series of 12 four-family units and one six-family unit with 13 separate entrances, and no hallways or entrances common to all of the 13 units. Hence, the development would and should be considered as 13 separate buildings, each of which would require its own separate front yard and rear yard, as provided by the ordinance.

While it is not held that the amendment of May 12, 1955, quoted above, is retroactive and controls the matter before us, it clearly demonstrated the intention of city council to provide the zoning ordinance with the same common sense definition of "separate building" which, in our opinion, should have been used by the zoning administrator and Zoning Board of Adjustment in the determination of this case.

Here again, if any hardship is involved by this interpretation, the remedy lies in an application for a certificate of variance under the ordinance.

Other objections were raised by the plaintiff, and the many objecting residents of the neighborhood. We believe we have established clearly that the permits in this case should not have been granted. Obviously, the owner has a valuable piece of land and should be permitted to develop it, but only after applying for proper relief, and after full hearings by the zoning board and a careful study to see that the development when completed will conform as closely as possible to the requirements of the zoning ordinance and will not create a fire hazard, traffic congestion and other obvious dangers.

Without in any way foreclosing the working out of the problems which will have to be solved by the owner-applicant and the zoning board, the court points out for their consideration the fact that virtually all the elements of danger might be eliminated if the plans

provided for a wide driveway, adequate for commercial vehicle and casual parking and for two-way traffic, to enter the property directly from Seventy-sixth Street, through the center of the 64-foot tongue of land leading to the main body of the lot, and thence eastward through the proposed open court and through the eastern end of the structure directly into the parking lot. If such direct access to the public streets were provided, there should not be too much difficulty in solving the other problems involved.

And now, October 20, 1955, the appeal of Rhoda Fleishon is sustained, the Zoning Board of Adjustment is reversed, and the permits issued to the applicant are revoked.

### Final Decree

October 20, 1955. The appeal of Rhoda Fleishon is sustained. The Zoning Board of Adjustment is reversed and the permits issued to the applicant are revoked.