K. DUN GIFFORD & others[1] *vs.* PLANNING BOARD OF NANTUCKET & others.[2]

Nantucket. October 5, 1978. — December 12, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Subdivision Control. Jurisdiction,* Subdivision control. *Practice, Civil,* Subdivision control appeal.

Where lots shown on a plan were so divided that each had a frontage on a public way of seventy-five feet as required by a zoning by-law but it appeared that the connection of each of a number of the lots to a public way was "by a long, narrow neck turning at an acute angle to provide frontage on the way," thus rendering vehicular access to the main parts of these lots inadequate, the plan failed to comply with the purpose of the frontage requirement and constituted a subdivision requiring the approval of the planning board. [803-809]

---

[1] Fourteen persons, like the plaintiff, residents of the town of Nantucket.

[2] Tristram's Landing, Inc., and the building inspector of the town of Nantucket.

CIVIL ACTION commenced in the Superior Court on December 24, 1976.

The case was heard by *Ford*, J., on a master's report.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Theodore L. Tillotson* for Tristram's Landing, Inc.

*Donald L. Connors* (*Andrew J. Ley* with him) for the plaintiffs.

KAPLAN, J. Tristram's Landing, Inc. (Tristram), owner of a forty-nine acre parcel of land on Nantucket Island, under date of November 15, 1976, submitted to the planning board of the town of Nantucket a plan to divide the parcel into forty-six lots, and, asserting the belief that the plan did not constitute a "subdivision" within the Subdivision Control Law, G. L. c. 41, §§ 81K-81GG, it applied pursuant to § 81P, as appearing in St. 1963, c. 363, § 1, for an endorsement by the board of "Approval Under the Subdivision Control Law Not Required." The board on the next day endorsed the plan as requested, and the endorsement was then filed with the town clerk. On December 6, 1976, the plaintiffs herein, fifteen residents of the town, commenced an action in the Superior Court, joining as defendants Tristram, the planning board, and Nantucket's building inspector, seeking under G. L. c. 41, § 81BB, to annul the board's endorsement.[3] As grounds,

_____

[3] The defendants did not dispute that the plaintiffs had an appeal within § 81BB as persons "aggrieved" from the planning board's action of "approval . . . not required" (see, for the availability of such appeal, *Carey* v. *Planning Bd. of Revere*, 335 Mass. 740, 743-745 [1957], referred to by Adams, Judicial Review under the Subdivision Control Law, 61 Mass. L.Q. 70, 73 [1976]; cf. *Cassani* v. *Planning Bd. of Hull*, 1 Mass. App. Ct. 451, 457 n.4 [1973]); and while Tristram alleged that the plaintiffs had not timely notified the town clerk of the commencement of this action, it did not press the point and may be taken to have abandoned it. The action was cast alternatively under c. 41, § 81Y, and the plaintiffs therefore styled themselves "taxable inhabitants," but it is unnecessary to consider this alleged head of jurisdiction (see *Bloom* v. *Planning Bd. of Brookline*, 346 Mass. 278, 283 [1963]; *Carey* v. *Planning Bd. of Revere*, *supra* at 743; *Nantucket Land Council, Inc.*

the plaintiffs alleged, first, that the plan constituted a subdivision within the law, and, second, that the plan (whether or not constituting a subdivision) disclosed violations of the Nantucket zoning by-law.

After answer, Tristram moved for summary judgment relying on the maps annexed to its plan and adding an affidavit of counsel referring to the requirements of law. This was met by a cross motion by the plaintiffs for summary judgment, supported by an affidavit, with many exhibits, of a land use planner and architect containing the results of an examination of the locus and an analysis of the plan in relation to the facts; also affidavits of police and fire officials. The defendants did not tender any materials in reply. The judge referred the motions to a master who, after hearing, recommended with brief memorandum that judgment enter for the plaintiffs on the motions. The judge accepted the recommendation without further opinion. Tristram lodged an appeal in the Appeals Court, and we transferred the case here on our own motion.

As a preface to considering the substance of the master's recommendation, we note that a "subdivision" is defined by G. L. c. 41, § 81L, as amended through St. 1965, c. 61, as "the division of a tract of land into two or more lots," but there is excepted from this definition, and regarded as not a subdivision for purposes of the law, such a division of a tract of land "if, at the time when it [the division] is made, every lot within the tract so divided has frontage on (*a*) a public way or a way which the clerk of the city or town certifies is maintained and used as a public way."[4] Section 81L continues: "Such frontage shall

v. *Planning Bd. of Nantucket,* 5 Mass. App. Ct. 206, 211-213 [1977]; *Cassani* v. *Planning Bd. of Hull, supra*), or the possibility of proceeding by declaratory suit under G. L. c. 231A, § 1, also referred to in the complaint (see *Cassani* v. *Planning Bd. of Hull, supra* at 458; cf. *Green* v. *Commissioner of Corps. & Taxation,* 364 Mass. 389, 390 [1973]; *Sears, Roebuck & Co.* v. *Somerville,* 363 Mass. 756, 757-759 [1973]).

[4] Section 81L recites as an alternative to (*a*), "(*c*) a way in existence when the subdivision control law became effective in the city or town in which the land lies, having, in the opinion of the planning board,

be of at least such distance as is then required by zoning or other ordinance or by-law, if any, of said city or town for erection of a building on such lot, and if no distance is so required, such frontage shall be of at least twenty feet." The Nantucket zoning by-law, § V, requires for the present district a frontage of seventy-five feet.

In the master's view there was no genuine issue of fact. Each of the forty-six lots did extend to a public way and bordered thereon for not less than seventy-five feet. But it plainly appeared that the connection of each of a number of the lots to a public way was "by a long, narrow neck turning at an acute angle to provide frontage on the way," so that "[i]t would be most difficult, if not impossible, to use this neck as a way because of the angle and its width." Practical vehicular access to the main or buildable parts of these lots was thus inadequate. There was no more than a purely formal or technical compliance with the frontage requirement. The master concluded that the plan was "an obvious attempt to circumvent the purpose and intent of the Subdivision Control Law"; what was disclosed was a subdivision that must meet the exacting requirements of the law and the "Rules and Regulations Governing the Subdivision of Land" of the Nantucket planning board promulgated thereunder,[5] and secure the approval of the planning board after public hearing. The master also made mention of nonconformance to the zoning by-law.[6]

---

sufficient width, suitable grades and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land abutting thereon or served thereby, and for the installation of municipal services to serve such land and the buildings erected or to be erected thereon."

[5] Among the many requirements of the Rules and Regulations, note that the "Site Analysis Report" to be furnished by the developer must speak to the adequacy of the internal circulation provided for vehicular traffic and to the ability of emergency vehicles to serve the new neighborhood. § 2.05d (9).

[6] As to provisions of the by-law other than that as to frontage which is incorporated by reference in § 81L of the statute, see note 10, *infra.*

Agreeing with the master's approach to the case, we first set out the undisputed facts in somewhat greater detail and then comment on the law.

The locus is at the western end of the island in the village of Madaket, some five to six miles from the center of town from which police and fire protection and certain other necessities must emanate. The district is zoned as "Residential 2" for one-family dwellings. Access to the locus is primarily by Madaket Road, a paved road in good condition; there is additional access by Cambridge Street which intersects Madaket Road and is unpaved and in relatively poor condition. The parcel is bounded on the north by Madaket Road, on the west by Cambridge Street, and on the south and east by Long Pond.

Examining the skeletal map appearing as an appendix to this opinion—a simplified version of one of the maps included in Tristram's application to the planning board —the reader will see the pattern of the proposed division of the westerly portion of the parcel including the twenty-one lots numbered 671 to 691. The lots would severally extend either to Madaket Road or Cambridge Street and border on one or the other of these public ways for seventy-five feet. But take lot 677 as one of the more extreme examples: it has a neck 1,185 feet in length,[7] with seven changes of direction until it reaches Madaket Road; it narrows at one stage to seven feet, a width less than that of any fire vehicle in use on Nantucket, and at the first change of direction there is insufficient turning radius. Lot 682 (with a neck 1,160 feet long, six changes of direction, and insufficient turning radius) illustrates a further problem: the neck reaches Cambridge Street at so acute

---

[7] The consequence of so long a neck is that the "approximate percentage of buildable zone area" to "total area of parcel in square feet" is only 36%. The percentage falls below 50% as to fifteen lots. See note 10 infra.

an angle, twelve degrees, that access and egress are great-
ly impeded and rendered hazardous. More generally, the
land use planner finds for the whole parcel with forty-six
lots that the necks range from forty to 1,185 feet in
length: twenty-nine are over 300, sixteen over 500, and
five over 1,000 feet. Thirty-two necks change direction
twice or more: nine change three times, one four times,
five five times, one six times, and two seven times. There
are three instances of necks that narrow to ten feet or
less, and six to not more than twelve feet. In a considera-
ble number of cases the neck debouches on the public way
at a bad angle. The report singles out eight lots as "either
too narrow or because of directional changes [having]
insufficient turning radius within the lot to accommodate
emergency or service vehicles"; ten lots which "because
of their configuration and intersection with the public
way servicing them do not provide adequate access to or
egress . . . in either direction of the public way"; and nine
lots which (to add a collateral factor not already men-
tioned) "have inadequate and unsafe sight distances at
the intersection of lot and public way."

The chief of police alludes to the last point in his affida-
vit when he states that structures on the "building or
main portions" of seventeen lots could not be adequately
observed from the abutting roads by police officers con-
ducting regular patrols. His emphasis, however, is on the
difficulties of access under the plan. He points to the
confusion and loss of time officers responding to emergen-
cies might encounter at certain locations on the public
ways in determining which neck served the particular
structure aimed at, and then in extricating themselves if
they should start down the wrong neck. The assistant fire
chief states in his affidavit that "suitable access . . . does
not exist" for passage of fire vehicles (all eight feet wide)
to the main portions of six lots because of the narrow
necks or their "acute angular changes in direction"; and
there are other lots that "would be difficult to navigate
within their lot lines." Adding to this the factor of confu-

sion, the affiant concludes that under the plan "a signifi-
cant hazard exists for the homeowner and the safety of
his dwelling in the event of fire."

Section 81M of the Subdivision Control Law states that
it "has been enacted for the purpose of protecting the
safety, convenience and welfare" of residents "by regulat-
ing the laying out and construction of ways in subdivi-
sions providing access to the several lots therein"; and,
further, that "[t]he powers of a planning board . . . shall
be exercised with due regard for the provision of adequate
access to all of the lots in a subdivision by ways that will
be safe and convenient for travel." In conformance with
this text, we have emphasized repeatedly that a principal
object of the law is to ensure efficient vehicular access to
each lot in a subdivision, for safety, convenience, and
welfare depend critically on that factor. See *Costanza &
Bertolino, Inc.* v. *Planning Bd. of N. Reading*, 360 Mass.
677, 679-680 (1971); *Stoneham* v. *Savelo*, 341 Mass. 456,
458 (1960); *Daley Constr. Co.* v. *Planning Bd. of Randolph*,
340 Mass. 149, 153 (1959) (reviews legislative history).
And we have interpreted the statute so as to further that
goal, as have other courts in respect to like legislation.
See *Kuklinska* v. *Planning Bd. of Wakefield*, 357 Mass.
123, 130 (1970); *Sansoucy* v. *Planning Bd. of Worcester*,
355 Mass. 647, 649 (1969); *Trottier* v. *Lebanon*, 117 N.H.
148, 150 (1977); *Noble* v. *Township Comm. of Mendham*,
91 N.J. Super. 111, 117-120 (1965).

Where our statute relieves certain divisions of land of
regulation and approval by a planning board ("approval
. . . not required"), it is because the vital access is reason-
ably guaranteed in another manner. The guaranty is ex-
pressed in §§ 81L and 81P of the statute in terms of a
requirement of sufficient frontage for each lot on a public
way. In the ordinary case, lots having such a frontage are
fully accessible, and as the developer does not contem-
plate the construction of additional access routes, there is
no need for supervision by the planning board on that
score. Conversely, where the lots shown on a plan bor-

dered on a road "not in any practical sense ... in exis-
tence as a way," and thus incapable of affording suitable
access to the lots, we insisted that the relevant plan was
a subdivision under the then current law. *Rettig* v. *Plan-
ning Bd. of Rowley*, 332 Mass. 476, 481 (1955).

If the purpose of a frontage requirement is to make
certain that each lot "may be reached by the fire depart-
ment, police department, and other agencies charged
with the responsibility of protecting the public peace,
safety and welfare" (*Mitchell* v. *Morris*, 94 Cal. App. 2d
446, 448-449 [1949]), then in the plan at bar frontage fails
conspicuously to perform its intended purpose, and the
master and the judge were right to see the plan as an
attempted evasion of the duty to comply with the regula-
tions of the planning board.[8] The measure of the case was
indicated by the master (and by counsel at argument
before us) in the observation that the developer would
ultimately have to join some of the necks to provide ways
from lots to the public way: but that is an indication that
we have here a subdivision requiring antecedent approv-
al.

We stress that we are concerned here with a quite ex-
ceptional case:[9] a plan so delineated that within its provi-
sions the main portions of some of the lots are practically

---

[8] "When an act is condemned as an evasion what is meant is that
it is on the wrong side of the line indicated by the policy if not by the
mere letter of the law." *Bullen* v. *Wisconsin*, 240 U.S. 625, 630-631
(1916) (Holmes, J.).

[9] Counsel refer us to an earlier attempt to use "rat tail" or "pork
chop" configurations to evade the law. In *Chase* v. *Christensen*, Superi-
or Court, Plymouth County No. Eq. E3614 (1971), the planning board
of Marshfield refused an endorsement of "approval ... not required"
on a plan for forty lots very similar to the plan at bar in its use of
narrow, lengthy strips running from the buildable parts of the lots to
the public way. The judge on October 28, 1971, entered findings, rul-
ings, and order upholding the board's decision. He wrote that the plan
was "a crass and brazen attempt" to evade the law. He said it was the
obvious intention of the developer to use the narrow strips in combina-
tion to provide access to the public way, and the plan disclosed a
subdivision requiring planning board approval.

inaccessible from their respective borders on a public way. To hold that such a plan needs approval is not to interfere with the sound application of the "approval . . . not required" technique.

In the view we have taken, it is not necessary to deal with alleged violations of the town's zoing by-law with respect to minimum lot size or front yard.[10]

*Judgment affirmed.*

---

[10] See note 6, *supra*. The parties appeared to assume that a violation of any of the provisions of the town by-law appearing on the plan would disqualify the plan for endorsement as "approval . . . not required." In this connection we note, without passing on the points, that the land use planner suggested (i) that certain of the lots would not meet the minimum lot area requirement (20,000 square feet for a residential 2 district, see by-law, § V), when neck area was deducted from total area, as he thought it should be (compare *Shorehaven in Manhasset* v. *Great Neck Estates*, 22 N.Y.S.2d 944 [Sup. Ct. 1940], with *Loveladies Property Owners Ass'n* v. *Barnegat City Serv. Co.*, 60 N.J. Super. 491 [1960]); (ii) that there would also be numerous violations of the front yard requirement (twenty feet in such a district, see by-law, § V) as this yard should be measured from the public way and required a greater width than would be provided by a number of the necks (compare *Fleishon* v. *Zoning Bd. of Adjustment*, 6 Pa. D. & C.2d 337 (1955), aff'd 385 Pa. 295 [1956], with *Baltimore* v. *Princeton Constr. Co.*, 229 Md. 176 [1962]).