Whitehead, J.
Introduction
This is an action brought by two developers of land against the Gloucester Planning Board, appealing the Board’s denial of an “approval not required” (ANR) endorsement on a plan for the division of land, which endorsement the plaintiffs had sought pursuant to G.L.c. 41, §81P. Jurisdiction is conferred upon the Court pursuant to G.L.c. 41, §81BB. The case was tried by the Court without a jury on August 22, 1995 — August 23, 1995. On August 23, 1995, the Court took a view of the property in question. The following constitute the Court’s findings of fact, rulings of law and order for judgment after trial.
Findings of Fact I Procedural Issues
The plaintiff, Patrick Titus, is a resident of Gloucester and is engaged in business as a licensed general contractor. The plaintiff, John Lampe, is a resident of Hamilton and is engaged with Titus in a joint venture to develop certain property on Bennett Street, in Gloucester. The defendant, the Planning Board of Gloucester, is the municipal agency charged with administering the Subdivision Control Law for the City of Gloucester.
In the Spring of 1994, the plaintiffs entered into an agreement for the purchase of a parcel of land known as Lot 60, on Bennett Street, in Gloucester. The parcel was comprised of approximately 12.09 acres. The purchase of the property was contingent upon the plaintiffs’ obtaining an ANR endorsement from the Planning Board.
Because that portion of Bennett Street which abuts the property is in extremely rough condition (about which more will be said later), and because they wished to develop the property with new homes, the plaintiffs retained the services of a registered land surveyor and an (unlicensed) engineer for the purpose of creating a road improvement plan. A tentative plan was prepared by May 13, 1994.
Once a tentative plan had been prepared, the plaintiffs contacted the City Planner, John Grande, who came to the property and reviewed the plan with the plaintiffs’ surveyor, James Klopotowksi. During that review, Grande confirmed that the road was inadequate in its current state,[1] and he pointed out certain deficiencies in the road improvement plan as well. Subsequently, members of the Planning Board visited the site, and they, too, pointed out deficiencies in the plan. These visits were undertaken on an informal basis. The plan was never formally submitted to the Planning Board.[2]
Meanwhile, the plaintiffs obtained the services of Attorney John Vallis for the purpose of securing from the Planning Board an ANR endorsement on the plan for dividing the land itself. On August 15, 1994, Vallis filed with the Board a formal application for such an endorsement (Ex. 1). The application was accompanied by a cover letter (Ex. 4), a copy of the plan dividing the land (Ex. 2) and a letter addressed “To Whom It May Concern,” dated July 21, 1995, bearing the purported signature of the City Clerk[3] and certifying that Bennett Street had been “laid out and accepted as a public street” in October, 1707. By way of the cover letter, Attorney Vallis requested that the Board take up the application for an ANR endorsement at its next regular meeting, which was scheduled for that very evening.
The Board did, in fact, take up the application at its August 15th meeting. At that time, the plaintiff submitted a new road improvement plan (Ex. 3). However, because the submission did not comply with the Board’s written procedural requirements concerning the filing and consideration of road improvement plans, the Board did not consider the new plan. Such being the case, approval of the application stood or fell *577 on a consideration of the condition of the land and the condition of Bennett Street as it then existed. The Board’s action at the conclusion of the meeting was recorded in the minutes (Ex. #9) as follows:
MOTION: [A Board Member] made a motion based on the condition of Bennett Street, the subdivision grade, site distances, and the lack of adequacy on the street, the plan of land for [the plaintiffs], for a creation of seven lots at Bennett Street, does require approval under the Subdivision Control Law.
SECOND: [A Board Member]
VOTE: 5-0
Thus, the application for an ANR endorsement was implicitly denied.
On the next day, August 16, 1994, Attorney Vallis sent to the Gloucester City Clerk a copy of the cover letter which had accompanied the application to the Board on the previous day. He also sent a “cover letter to the cover letter,” stating as follows:
Re: Form A Filing
Assessors Map 115, Parcel 22
Bennett Street, Gloucester, MA
Dear Sir/Madam:
Enclosed for filing, please find copy of letter to Mr. Jay Grande to serve as notice of this filing. Please do not hesitate to contact me if you should have any questions.
(Ex. 5).
Relying on the general principle that a letter mailed may be inferred to have been received, the Court infers that Mr. Vallis’ letter was received by the Clerk’s Office. It since has been misplaced.[4]
On August 18, 1994, Grande, in his capacity as City Planner and agent for the Planning Board, wrote a memorandum addressed to the plaintiffs and formally stating that the Board had “made a determination that the [plaintiffs’ plan] does require approval under the Subdivision Control Law” (Ex. 8). Grande gave the original of the memorandum to the Clerk of the Planning Board and directed that she mail copies to the plaintiffs and to various city officials, including the City Clerk. Even without such direction, it is the normal practice of the Clerk of the Planning Board to notify the City Clerk as well as all other appropriate parties, of denials of ANR endorsements. Although there was no direct testimony on the point, I infer that, on or about August 18, 1994, the Clerk of the Planning Board followed her normal business practice and did notify the City Clerk of the Planning Board’s action in this case. However, the City Clerk did not record that action at the time. In fact, no such recordation occurred until September 13, 1994, when, pursuant to an inquiry by Titus as to whether or not recordation had occurred, Grande faxed to the City Clerk a second copy of his memorandum memorializing the Board’s decision.
Titus testified that he did not receive written notice of the Board’s action until the fax was handed to him at the City Clerk’s office on September 13, 1994. However, the Court finds that the Clerk of the Planning Board mailed Grande’s memorandum to him at his correct address, 33 Trask Street, Gloucester, on or about August 18, 1994. The Court infers that the memorandum was received. This is not to say that Titus gave false testimony on the point. Grande’s memorandum, although stating that the Board had made a determination that the subdivision plan required Board approval, also stated that “(a]n official copy of the approved minutes of the Board will be sent to you in the near future.” Given that Grande’s document was in “memorandum” form, and given that it alluded to the future deliveiy of “official” documents, Titus may well have concluded at the time he first received Grande’s memorandum that it had no legal significance as “notice” of the Board’s decision, and he therefore may not recall having received it.[5]
The plaintiffs commenced this action on September 26, 1994, thirteen days after notice of the Planning Board’s decision was recorded in the office of the City Clerk. The City Clerk received notice of that fact on the same day (Ex. #29).
II Issues Regarding the Merits
The plan for the division of land proposed by the plaintiffs would divide the subject parcel into seven buildable lots with a “remainder” lot comprising approximately 6.8 acres. The seven buildable lots all have frontage on Bennett Street sufficient to satisfy the Gloucester Zoning Ordinance.[6] Access easily could be had from Bennett Street to each lot if one engaged in the clearing of trees and grading of land which typically occurs during the construction of residential units.
The records of the City of Gloucester (Ex. 13) establish that the way now known as Bennett Street was laid out by the selectmen of the then Town of Gloucester on October 21, 1707. The records of the Selectmen’s meeting of that date initially describe the way as a “private way for the inhabetants (sic) of said town of Gloucester [laid out] by order of said town . ..” The records proceed to describe the way by reference to landmarks, many of which are long gone. Because the way ran over private property, compensation for the taking of a portion of that property was given to the various owners in the form of alternate property. Acknowledging such compensation, at least two of those owners executed releases which purported to “aquit (sic) and discharge the said town of Gloucester from any further claim of satisfaction for said ways going over our land.” Certain gates were to be erected across the way, and particular property owners were provided compensation in the form of land in exchange for their agreement to maintain those gates.
The records further indicate that “at the general town meeting in Gloucester (sic) March 3, 1707/8 the *578 town allowed and confirmed the above said way to be a stated town way for the inhabetants (sic) by ovat [?][7] in the town meeting.”
A city map, prepared in 1839 describes the aforementioned way as “Road over the Hill” and shows it to be a public way. A record book of the City entitled “Sheets and Roads Accepted” contains a section denominated “Report of Committee on Naming Streets”, dated, December 3, 1877. The report indicates that the way was formally given the name “Bennett Sheet” on that date. The records of the City Engineer, which are derived from the records mention above, describe Bennett Sheet as a “public street.”
In terms of modern landmarks, Bennett Street runs in a southerly direction from Washington Sheet to Dennison Sheet. That portion of Bennett Sheet closest to Washington Sheet is paved for a distance of several hundred yards. The roadway is smooth and barely wide enough for two conventional automobiles to pass each other. In recent years, there have been constructed along the sheet a number of substantial homes[8] with frontage on the paved portion of the street. The lots on which those homes were built all received ANR endorsements. However, in each instance, the endorsement was granted subject to the execution of a road improvement plan for the portion of the sheet on which the lots front.
The portion of Bennett Street closest to Dennison Sheet has been improved to a lesser extent than the portion closest to Washington Sheet. During its view, the Court observed that the roadway appeared to be fully paved for a distance of several hundred yards, after which, for a few hundred feet more, the road surface appeared to consist of some form of surface hardener short of pavement. The grade is steep from Dennison Sheet to a point just before the closest boundary of the plaintiffs’ property, after which it levels off and begins gradually to descend. At some point over the steep section, the grade is such that the road winds in “switchback” fashion. It is only wide enough for one vehicle to pass at a time.
In recent years there have been constructed along the portion of Bennett Sheet closest to Dennison Street approximately one-half dozen to a dozen homes of average size. The lots on which those homes have been built all received ANR endorsements. The plans so endorsed described Bennett Street as a “public” street. The endorsements were not contingent upon the execution of a road improvement plan, because a road deemed adequate by the City was in place. However, the road has never been brought up to the standards for road improvement which are contained in the Gloucester City Ordinances.
The portion of Bennett Sheet just described gives the impression of a neighborhood, albeit one located in a semi-rural woodland. The City provides trash collection and snowplowing services up to the point where the plaintiffs’ property begins. Private commercial vehicles service the homes on the sheet. (A “UPS” huck was observed by the Court during its view.) Mail and newspapers are delivered to the individual homes. The last home on the plaintiffs’ side of the street abuts the plaintiffs’ property. With the exception of the horse farm referenced immediately below, the last home on the other side of the sheet lies just before the commencement of the plaintiffs’ property.
Located almost directly across from that point on Bennett Sheet where the plaintiffs’ property commences is the entrance to a small horse farm. Vehicles hauling horse hailers proceed along Bennett Sheet from the farm to Dennison Sheet, and vice-versa. Like the other parcels on the street, the parcel on which the farm is located has obtained an ANR endorsement. The farm property extends along Bennett Sheet from a point just opposite where the plaintiffs’ property commences to a point opposite the most distant (northernmost) boundary of Lot #5 on the plaintiffs’ plan.
At approximately the point where the plaintiffs’ property commences, the paved surface of Bennett Sheet ends. For approximately one-half mile beyond that point, the road is a hardened dirt road, slightly wider than a conventional automobile. Through the frontage of Lot #5 on the plaintiffs’ plan, the road is relatively smooth and allows passage to a conventional automobile. However, at approximately the commencement of Lot #6, the road becomes deeply rutted and is obshucted by prohuding rocks, some approximately 11/2-2 feet high. Passage by conventional automobile along the frontage of Lots ##6 and 7 is, if not totally impossible, at least practically impossible. Passage by means of an off-road vehicle is difficult. Day-to-day access to Lots ##6 and 7 by a typical homeowner or by active neighborhood haffic could not be effected without significant re-grading of the road surface.
In sum, then, Bennett Sheet is a roadway which was laid out and accepted by the municipality for public use almost 300 years ago. It probably was used by the public for at least some period of time after it was laid out, since gates were required to be maintained along the road. Although both ends of the road have been updated and developed in recent years, the middle portion of the road, along which the plaintiffs’ property lies, has fallen into apparent disuse and disrepair. As one proceeds along the road from the direction of Dennison Street, it becomes impassable, for practical purposes, at approximately the commencement of Lot #6 of the property and remains impassable for the balance of the frontage of the property.[9]
Conclusions of Law
I. Statutory Framework Relative to ANR Determinations
General Laws c. 41, §810 provides that no one may subdivide land in a city or town in which the Subdivision Control Law is in effect, as it is in Gloucester, *579 without first submitting a plan of the proposed subdivision to the municipality’s planning board for approval, and receiving it. Chapter 41, §8 IP provides, however, that anyone planning to divide his or her property and who “believes that his plan does not require approval under the subdivision control law, may submit his plan to the planning board . . . and, if the board finds that the plan does not require such approval, it shall . . . endorse thereon . . . the words ‘approval under the subdivision control law not required’ or words of similar import. .. Such endorsement shall not be withheld unless such plan shows a subdivision”.
Chapter 41, §8 IT provides that every person submitting a plan for an ANR determination must give written notice to the municipal clerk that he has done so. The Appeals Court has held that, at least where an applicant relies on the planning board’s inaction on the application as the basis of a claim that he is entitled to an ANR endorsement by operation of law, such notice to the municipal clerk must be provided “simultaneously with” or “very promptly after” filing of the application with the planning board. Korkuch v. Planning Board of Eastham, 26 Mass.App.Ct. 307, 308-09 (1988).
Section 8 IP provides that, “(i]f the board shall determine that in its opinion the plan requires approval, it shall within fourteen days of such submittal, give written notice of its determination to the clerk of the city or town . . . and the person submitting the plan... If the board fails to act upon a plan submitted under this section or fails to notify the clerk of the city or town . . . and the person submitting the plan of its action within fourteen days after its submission, it shall be deemed to have determined that approval under the subdivision control law is not required and it shall issue a certificate to the same effect...”
Lastly, G.L.c. 41, §81BB provides that a person aggrieved by the denial of an ANR endorsement “may appeal to the superior court . . . provided that such appeal is entered within twenty days after such decision has been recorded in the office of the cily or town clerk or within twenty days after the expiration of the required time ... as the case may be, and notice of such approval is given to such city or town clerk so as to be received within such twenty days.”
II.Timeliness of Notice to the City Clerk by Plaintiffs
In the present case, the Planning Board contends that the plaintiffs failed timely to notify the City Clerk of their application for an ANR endorsement as required by G.L.c. 41, §81T and that this Court is therefore without jurisdiction to hear their appeal from the Board’s denial of the application. However, it does not appear that compliance with the notice requirement of §8 IT is a jurisdictional prerequisite to an appeal brought under §4IBB. The Korkuch case, supra, cited by the Board in support of its contention, appears to hold only that a planning board’s failure to act on an ANR application within the period prescribed by §8IP will not operate by law as an approval of the application where the applicant himself had failed timely to notify the municipal clerk of the fact of his application, as required by §8 IT. In any event, whatever the import of an applicant’s failure timely to notify the municipal clerk the Court has found that the plaintiffs here notified the City Clerk of Gloucester of their application on the day after they filed the application with the Planning Board. The Court concludes that notice so given comports with the requirements of §8 IT, in that it was given “simultaneously with” or “very promptly after” filing with the Planning Board. Korkuch, supra.
III. Timeliness of Notice to City Clerk by Planning Board
The plaintiffs contend that, not only did they comply with the notice requirements imposed upon them, but the Planning Board failed to comply with the notice requirements imposed upon it. Specifically, they assert, the Board failed to give the Cify Clerk, and the plaintiffs themselves, written notice of its denial of an ANR endorsement within fourteen days of that denial, as required by G.L.c. 41, §8IP. Hence, they further assert, they are entitled to an ANR endorsement by operation of law. However, the Court has found as a fact that the Board sent the required notice both to the City Clerk and the plaintiffs within approximately three days after it made its decision. Such being the case, the Board has satisfied the requirements of §81P.
IV. The Merits of the ANR Determination
The Court thus turns to the merits of the Board’s decision denying to the plaintiffs an ANR endorsement. As stated earlier, subdivision approval is not required (and an applicant is therefore entitled to an ANR endorsement) when the plan of land submitted to the Board does not show a “subdivision” within the meaning of the Subdivision Control Law.
General Laws c. 41, §81L defines a “subdivision” as follows:
Subdivision shall mean the division of a tract of land into two or more lots and shall include resubdivision, and, when appropriate to the context, shall relate to the process of subdivision of the land or territory subdivided; provided, however, that the division of a tract of land into two or more lots shall not be deemed to constitute a subdivision within the meaning of the subdivision control law if, at the time when it is made, every lot within the tract so divided has frontage on (a) a public way or a way which the clerk of the city or town certifies is maintained and used as a public way, or (b) a way shown on a plan theretofore approved and endorsed in accordance with the subdivision control law, or (c) a way in existence when the subdivision control law became effective in the city or town in which the *580 land lies, having, in the opinion of the planning board, sufficient width, suitable grades and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land abutting thereon or served thereby, and for the installation of municipal services to serve such land and the buildings erected or to be erected thereon. Such frontage shall be of at least such distance as is then required by zoning or other ordinance or by-law if any, of said city or town for erection of a building on such lot, and if no distance is so required, such frontage shall be of at least twenty feet.
The plaintiffs assert that the plan here in question does not create a “subdivision” within the meaning of §81L because each lot created by the plan has sufficient frontage on Bennett Street to satisfy the Cily’s Zoning By-Law and because Bennett Street is “a public way or a way which the clerk of the city . . . certifies is maintained and used as a public way.” The Court has found that the certification which was tendered by the plaintiffs in this case was not authentic, in that it was signed neither by the City Clerk himself nor by someone who had authority to sign his name. Thus, an exemption of the plan from the definition of “subdivision” turns on the question of whether or not Bennett Street is an actual “public way.”
A public way must be distinguished from a “statutory private way.” A public way is a way laid out by a municipality for the equal benefit of all of its citizens. Any damages resulting from the taking of the way, if there was a taking, are assessed against all, and all have a right of passage upon the way. A “statutoiy private wag” is a way which has been laid out by the municipality primarily for the benefit of a limited number of its citizens. Although all citizens may pass upon the way, damages resulting from any taking of the way are assessed only against those for whose primary benefit the way was created. See generally Denham v. County Commissioners of Bristol, 108 Mass. 202, 207 (1871); Flagg v. Flagg, 82 Mass. 175, 179-81 (1860). Both types of way are basically “public” in character. However, the Supreme Judicial Court has held that a “statutory private way” is not the legal equivalent of a “public way” for the purposes of the Subdivision Control Law. Casagrande v. Town of Harvard, 377 Mass. 703, 708 (1977).
The Appeals Court has observed that municipal “public ways’ may be created in one of three manners: ”1) a laying out by public authority in the manner prescribed by statute; 2) prescription; and 3) prior to 1846, a dedication by the owner to public use, permanent and unequivocal, coupled with an express or implied acceptance by the public." Fenn v. Middleborough, 7 Mass.App.Ct. 80, 83-84 (1979). (Citations omitted.) With respect to the first manner, the statute governing the “laying out" of town ways in 1707, when Bennett Street was created, was Chapter VIII of the Colonial Acts of 1693. The statute provided, in relevant part, as follows:
. . . the Select-Men of each Town respectively . . . are hereby impowered, by themselves, or others whom they shall appoint; to lay out or cause to be laid out, particular and and (sic) private Ways for such Town only, as shall be thought necessary; fo (sic) as no Damage be done to any particular Person in his Land or Propriety without due Recompense to be made by the Town; as the Select-Men and the Party interested may agree; or as shall be ordered by the Justices in Quarter Sessions, upon Enquiry into the same, by a Jury to be summoned for that Purpose.
Although the statute refers to ways created by its authority as “private ways for such Town only,” the term is used simply to distinguish them from “highways,” which run across town boundaries and which are referenced elsewhere in the statute. Butchers’ Slaughtering Association v. Boston, 139 Mass. 290, 292 (1885) (construing predecessor to the 1693 statute, in which identical language is used). In fact, the town ways created by the statute are wholly public in nature, in that they are laid out by the town; they are laid out for the benefit of the town as a whole; and damages resulting from any taking are assessed against the town. Thus, the ways so created are “public ways” within the meaning of modern parlance. I'd.[10]
The records of the then town of Gloucester, generated in 1707, when the way now known as Bennett Street was first laid out, confirm that it was created in conformity with the 1693 Act and therefore constitutes a “public way.” The records establish that the way was laid out by the selectmen as a “private way for the inhabetants (sic) of said town.” They also state that “the town allowed and confirmed the . . . way to be a stated town way for the inhabetants (sic).” Damages for private property taken when the way was created appear to have been paid by the town as a whole and not by individual private beneficiaries. Indeed, releases of claims for damages were executed as against the town. Moreover, the town, and not private individuals, provided property to certain landowners as compensation for maintaining gates that operated along the way.
Moreover, municipal documents generated since the creation of the way have consistently referred to the way as a “public way,” an “accepted street,” a “public street” or simply as “public.” The latter documents consist of plans of land which involve lots on Bennett Street and which received ANR approval. Lastly, although not determinatively, the City has, at least in recent years, plowed snow from the street and provided other municipal services to residents of the street (i.e., trash collection and water supply).
However, a conclusion that Bennett Street is a public way does not end the discussion. The policies *581 underlying the Subdivision Control Law are articulated in G.L.c. 41, §81M and include the following:
“. . . the provision of adequate access to all of the lots in a subdivision by ways that will be safe and convenient for travel; . . . lessening congestion in such ways and in adjacent public ways; . . . reducing danger to life and limb in the operation of motor vehicles; . . . securing safety in case of fire, flood, panic and other emergencies; . . . [and] securing adequate provision for . . . fire, police and other similar equipment...”
Noting those policies, and noting further “that the exclusions [from the requirement of subdivision approval] set out in §81L . . . [refer] to specific objective criteria apparently chosen by the Legislature for the quality of access they normally provide,” the Appeals Court has concluded that “whatever status might be acquired byways as ‘public ways’ for purposes of other statutes by virtue of their having been ‘laid out,’ such ways will not satisfy the requirements of the ‘public way’ exemption in §81L . . . unless they in fact exist on the ground in a form which satisfies the [aforementioned policies].” Perry v. Planning Board of Nantucket, 15 Mass.App.Ct. 145, 150-51 (1983) (citation omitted).
In 1955, the Supreme Judicial Court had employed an analysis similar to that articulated in Perry to declare that, even if a way was generally a legal “public way,” it was not a “public way” for the purposes of G.L.c. 81L where “[a]ll that appeared [upon a view of the property] were outlines of a ten foot roadway, once used by a vehicle or vehicles of unknown character, and ruts and a condition of impassibility due to rain.” Rettig v. Planning Board of Rowley, 332 Mass. 476, 481 (1955).
However, more recently, the Appeals Court has ruled a legal “public way” to be a “public way” for purposes of §81L where the trial court had made the following findings regarding the condition of the road:
. . . [The road] is a passable woods road of a dirt substance with some packed gravel approximately 11-12 feet in width, muddy in spots and close to impassable at very wet portions of the year. Angles for ingress and egress at either end onto [intersecting roads] are such that it would be very difficult for large emergency vehicles to turn onto [the road]. The road is wide enough for one car only . . . [The road] in its present condition, does not satisfy the requirement of safe access for emergency and other vehicles to the lots in question.
Sturdy v. Planning Board of Hingham, 32 Mass.App.Ct. 72, 75 note 10 (1992). Construing Perry and related cases narrowly, the Court stated that “a planning board may withhold ANR endorsement (where the tract has the required frontage on a public way) only where the access is ‘illusory in fact.’ ” Id. at 75 (citations omitted). The Court went on to declare that Gifford v. Planning Board of Nantucket, 376 Mass. 801 (1978), the case upon which the Perry decision was premised, “is the exceptional case and was not intended to broaden significantly the powers of planning boards under G.L.c. 41, §81L.” Id. at 76. The Court then concluded:
Deficiencies in a public way are insufficient ground for denying the endorsement. The ANR endorsement for lots fronting on a public way ... is a legislative recognition that ordinarily ‘lots having such a frontage are fully accessible, and as the developer does not contemplate the construction of additional access routes, there is no need for supervision by the planning board on that score.’ [Gifford, supra at 807.] Moreover, since municipal authorities have the obligation to maintain such ways, there is already public control as to how perceived deficiencies, if any, in such public ways are corrected . . . [PJublic officials can bring a municipality to task if it fails to perform its immediate road maintenance duties. Id. at 76.
The Court ultimately ruled that, under the circumstances, an ANR endorsement was mandated.
Thus, in the present case, the determinative issue is whether the public way known as Bennett Street is merely “deficient,” like the way involved in Sturdy, or whether it is “impassable,” such that the access contemplated by the General Court when it provided an exemption from subdivision approval to lots fronting on public ways is “illusoiy,” as was the case in Rettig. In that regard, this Court has found as a fact that, as one proceeds along Bennett Street from the direction of Dennison Street, Bennett Street is, for practical purposes, impassable to conventional automobiles, commencing with the closest (southernmost) boundary of Lot #6 on the plan in question and continuing across the whole of Lot #7. Thus, access to Lots ##6 and 7 is “illusoiy” at the present time, and the portion of Bennett Street on which those lots front cannot qualify as a “public way” within the meaning of §81L.[11] The Board properly declined to place an ANR endorsement on the plan.[12]
However, all is not lost for the plaintiffs. That portion of Bennett Street on which Lots ##1-5 front is clearly passable. It very much resembles the way which was deemed by the Appeals Court in the Sturdy case to qualify for the “public way” exemption under §81L. If the plaintiffs were to resubmit the plan proposing to create only those lots, they would be entitled to an ANR endorsement from the Board.
Moreover, the plaintiffs are not without remedies for acquiring an ANR endorsement with respect to Lots ## 6-7. The Appeals Court, in Perry, supra at 157-60, outlined several vehicles by which an abutter may effect the improvement of an impassable public way to a point where it qualifies for the §81L exemption. The plaintiffs may petition the town to upgrade the way. In the alternative, they may petition to have the *582 way discontinued, with the result that ownership would revert to the plaintiffs, who could then improve it themselves (albeit, to the satisfaction of the Board). Lastly, a form of self-help might be available to them even in the absence of such a reversion. Id. However, it is likely that ultimately, none of these remedies may be necessary. The plaintiffs appear willing to upgrade the roadway, and the Board appears willing to let them do it. The differences between the parties concern only the scope of the upgrade. The Court is confident that those differences will be resolved and that the plaintiffs eventually will be able to acquire an ANR endorsement for all of the lots currently proposed by the plan.
It is hereby ORDERED that the decision of the defendant Planning Board of the City of Gloucester be affirmed and that judgment enter in favor of the defendant in all other respects.

 Grande subsequently reduced his determination to writing (Ex. #25).

In fact, the plan did not bear the stamp of a registered professional engineer. The presence of such a stamp is a condition precedent to any consideration of a road improvement plan by the Board.

The Court accepts the testimony of the City Clerk that he neither signed the certificate nor authorized anyone to sign it on his behalf.

As will be noted below, both a document favorable to the plaintiffs and a document favorable to the Board are missing from the Clerk’s office.

As an aside, the Court notes that the ambiguous form which the document took might also explain why it was not recorded in the City Clerk’s Office.

The area is zoned a "R02" (residential). Frontage must equal or exceed 80 feet.

The records are set forth in longhand and appear to have been created contemporaneously with the events that they document. Hence, the language is sometime archaic and the writing difficult to read.

The homes along the roadway were observed by the Court during its view of the area.

The Court was not asked to determine the nature of the access to the property from the direction of Washington Street. Accordingly, the burden of proof being on the plaintiffs, the Court infers that there is no practical access to the property from Washington Street.

In the Butchers’ Slaughterhouse case, the Supreme Judicial Court stated that the early legislation “does not contemplate . . . private ways for the benefit of particular individuals, but as ways for the use of the town.” Id.

The fact that the defects in the road might be cured by regrading is immaterial. Poulos v. Planning Board of Braintree, 413 Mass. 359, 362 (1992).

The plaintiffs never contended that the property qualified under “exemption (b), ” set forth in §81L. Moreover, the Court’s conclusion regarding the impassibility of Bennett Street also precludes the property from qualifying under “exemption (c).”